UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GEORGE WASSOUF | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *  C.A. No. 11-10555-JLT |
| | * |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | * |
| | * |
| | * |
| Defendants. | * |

MEMORANDUM AND ORDER

August 16, 2011

TAURO, J.

For the reasons stated below, the Court (1) grants the plaintiff's motion to proceed in forma pauperis; (2) denies the motion for appointment of counsel; and (3) directs the plaintiff to show cause why this action should not be dismissed

**Background**

Approximately ten years ago, George Wassouf was convicted in the United States District Court for the District of New Hampshire of bank fraud. See United States v. Wassouf, Crim. No. 01-00001 (D.N.H.). He was sentenced to 33 months in prison and a 5-year period of supervised release.

Following the completion of his prison sentence and unsuccessful appeal of his conviction, he was ordered removed and ultimately was removed to Syria, where he now resides. On March 28, 2011, Wassouf brought this action–the fourth action he has brought in this Court challenging his removal in one way or another. See Wassouf v. United States, C.A. No. 09-11738-RWZ; Wassouf v. United States Immigration and Customs Enforcement, C.A. No. 10-10367-JLT;

Wassouf v. United States Dep't of Justice, C.A. No. 10-11169-JLT.  The present action is against the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), ICE employees involved in his detention and removal, the immigration judge who ordered him removed, counsel for the United States in the removal proceedings, DHS Secretary Janet Napolitano, former DHS Secretary Michael Chertoff, United States Attorney Eric Holder, former United States Attorney Michael Mukasey, and the United States Department of Justice.[1]  Wassouf also filed motions to proceed in forma pauperis and for appointment of counsel.

I.    **Factual Allegations**

The Court summarizes the facts as alleged in the complaint.

After being arrested on or about January 1, 2011 on the aforementioned bank fraud charge, Wassouf appeared in front of Magistrate Judge Robert B. Collings of this Court for a bond hearing. See United States v. Wassouf, M.J. No. 01-00402 (D. Mass.).  Wassouf was released on a bond secured by his mother's residence bond and he was required to surrender his passport.

In August 2001, Wassouf was convicted of bank fraud after having pled guilty of the same. He was sentenced in November 2001, at which time he sent a letter to Judge Collings asking for the return of his "collateral."  Judge Collings sent a letter back to Wassouf indicating that "in a [sic] ordinary case the plaintiff would have to file a motion, BUT stated that he issued an order and or directed his clerk to return Plaintiff's property."  Compl. ¶ 5.  The "house papers" were returned, but "somehow the respondents took 'stole' the Petitioner's Passport, and it remained with them since that time."  Id.

---

[1]Wassouf also refers to the defendants as "respondents."

On October 10, 2003, when Wassouf was no longer incarcerated, he was arrested by the DHS and placed in immigration detention. He was released on bond the next month. On March 24, 2004, the immigration proceedings were terminated without prejudice because the direct appeal of his federal bank fraud conviction was still pending.

On June 5, 2006, ICE Special Agent Gregory Nevano requested a "travel package" for Wassouf, even though there were no removal proceedings pending against him and a new arrest warrant had not been issued. Compl. ¶ 8. On October 5, 2006, Nevano issued a second arrest warrant for Wassouf. The same day, Nevano "used" Wassouf's passport to request travel documents for Wassouf from the Syrian embassy. Id. ¶ 9. At this point, Wassouf had not yet been arrested again or ordered to appear in front of an immigration judge.

On June 5, 2007, Wassouf was arrested by the DHS and placed in detention at the Suffolk County House of Correction in Boston.[2] He was not allowed to contact anyone, including an attorney, for four days. Immediately thereafter, he was transferred to El Paso, Texas, to undergo removal proceedings in front of Immigration Judge Robert S. Hough. These proceedings were also dismissed without prejudice on August 15, 2007, despite Wassouf's position that they should have been dismissed with prejudice. Later on, media reported that, at the time Judge Hough was hired by the Department of Justice, the hiring of immigration judges was inappropriately political.

Wassouf remained detained after August 15, 2007, even though a third arrest warrant had not issued. On August 23, 2007, a new arrest warrant issued. Between August 15, 2007 and

---

[2]It appears that this arrest occurred just after Wassouf completed a six-month period of incarceration for violation of the terms of his supervised released. See United States v. Wassouf, Crim. No. 06-10300-NMG; see also Rodi v. Southern New England Sch. of Law, 389 F.3d 5, 19 (1st Cir. 2004) (courts may take judicial notice of proceedings in other relevant cases).

August 23, 2007, the government obtained the records of Wassouf's conviction necessary to support its position that Wassouf was removeable.

On December 3, 2007, Judge Hough ordered that Wassouf be removed. Pending his removal, Wassouf unsuccessfully sought release on bond. The government "used" Wassouf's passport to obtain travel documents. Compl. ¶ 14. Wassouf was deported to Syria on August 23, 2008.

**II.     Legal Claims**

The complaint is in 18 counts. It appears that all of the claims are asserted against all of the defendants.

Count One is a claim for negligence and malicious prosecution under the Federal Tort Claims Act, 28 U.S.C. §§ 2679 et seq. ("FTCA"). Wassouf claims that he was deprived of "a fair and legal Immigration judge, causing his unlawful incarceration, and his unlawful deportation." Compl. ¶ 32. Wassouf represents that he presented an administrative claim to the Department of Homeland Security, and that the claim was denied on October 14, 2010.

Counts Two, Five, Six, Nine, Fifteen, Sixteen, and Seventeen concern the plaintiff's passport. Count Two is a claim for "Unlawful Property Seizure" and "Invasion of Privacy," in which Wassouf alleges that the defendants violated his right to due process and his right under the Fourth Amendment by unlawfully keeping his passport for years, "using" the passport after the immigrations proceedings were dismissed twice "without any prior federal court approvals, initiating any removal proceedings, and without the petitioner's consent." Id. ¶ 38. Wassouf alleges that, as a result of the misuse of his passport, he was unlawfully removed from the United States. In Count Five, Wassouf brings a claim for a violation of his Fifth Amendment right to due

4

process on the ground that the unlawful detention and use of his passport was the result of the defendants' failure to adopt, promulgate, and implement appropriate policies. Count Six is a claim for "Unlawful Confiscation of Personal Property," in which Wassouf alleges that his passport was unlawfully seized from him when he was taken in custody, that it should have been returned to him when his bond money was returned or when the first or second immigration proceedings were terminated. In Count Nine, Wassouf alleges that the defendants "adopted, promulgated, and implemented a policy and practice of deliberately depriving Plaintiff of his personal property [passport] without providing them with any remedy to recover that property." Id. ¶ 85. He further alleges that the defendants intentionally refused to return his passport, and that "they knew that by the time these facts are discovered, then, this petitioner is no longer within the United States, and it would be impossible for him to ask this Honorable court or any other court to intervene with his case." Id. ¶ 86.[3] Count Fifteen contains a claim under the FTCA for trespass and "intentional negligent supervision." Wassouf asserts there in that the defendants "intentionally obtained and used the petitioner's passport, [w]ithout any courts' [sic] approvals, consent, and or in a violation of any procedures or any legal justifications." Id. ¶ 121.

In Count Sixteen, labeled "Unreasonable Seizure, Abuse of Process; and negligence Supervision [sic]," Wassouf alleges that the defendants unlawfully used his passport and refused to

---

[3]Wassouf alleges that when he "contacted the court and the defendants after his release, in 2003, requiring about his passport, no one seem [sic] to know anything about it," and that he "just discovered the truth and these new facts, after his unlawful deportation, after it was illegally used to secure his unlawful deportation from the United States." Id. ¶ 9. He claims that, through a recent request under the Freedom of Information Act ("FOIA"), on or about May 2010, he obtained documents showing that the government requested travel documents for him even in the absence of a final order of removal. See Id. ¶¶ 8, 9, 116 & Exhibits G-1 and G-2. He implies that, prior to receiving the papers requested under FOIA, he did not know that the government was still in possession of his passport or that his passport had been "used" to request travel documents.

5

offer him just compensation for it. He also complains that the defendants "did not attempt to use peaceful means to resolve this case or defend its illegal actions" but instead "ignored the petitioner's requests." Id. ¶ 126. The plaintiff also claims that he was "prevented by circumstances beyond his control" from "fil[ing] a petition with this Honorable court to get his property [passport] back" and from filing timely petitions for review, "which would have been an automatic reversal of his unlawful removal order." Id. ¶ 124. He claims that, as a result of these "'intentional' negligent errors," he would not have been removed. Id. ¶ 127. In Count Seventeen, Wassouf repeats his allegations that the defendants misused his passport and then failed to provide him appropriate compensation.

Counts Three, Four, and Seven are claims for illegal detention. Wassouf alleges that he was wrongfully detained for one week (presumably from August 15 to August 23, 2007, between the termination of the second and third immigration proceedings) "without a valid, signed warrant or [Notice to Appear]." Id. ¶ 45. He claims that he had been promised by Judge Hough and the government's attorney that he would be released after the termination of the second immigration proceeding, but that he was instead detained so that his unlawful removal could be assured. He further claims that he was kept in illegal detention "based on his race, religion, and/or ethnic or national origin." Id. ¶ 73.

In Count Eight, Wassouf claims that he was denied his right to assistance of counsel because he "was held for extensive periods of time in what is tantamount to criminal detention without allowing him to contact [his] counsel or anyone, for over four days," and then was transferred to a different state, "forcing him to plea his own cause" without the assistance of counsel. Id. ¶ 78. He further alleges that he was not brought to trial within a reasonable period of

6

time, "resulting in oppressive and lengthy pretrial incarcerations," and that, when he was brought to trial, "his case was stated and assigned to unlawful [sic] Immigration judge." Id. ¶ 79. In Count Thirteen, Wassouf alleges that his Fifth Amendment rights were violated when the defendants detained him "without allowing him to contact his attorney . . . or his consulate for four days, and then transferring his case to a different states [sic], forcing him to plea his own case, and subjecting him to a 'communications blackout' and other measures while in DHS detention that interfered with is due process 'abuse', his access to lawyers and the courts." Id. ¶ 110.

In Counts Ten and Twelve, Wassouf brings claims under the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATS"). In Count Ten, he claims that his "arbitrary detention" was in violation of "customary international law" as "defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities." Id. ¶ 92. He does not identify the detention in question. In Count Twelve, he alleges that all of the misconduct alleged in the complaint constituted "cruel, inhuman or degrading treatment in violation of the law of nations." Id. ¶ 105. Wassouf does not cite specific treaties or sources of international law in either Count.

In Count Eleven, Wassouf brings a claim under Article 36 of the Vienna Convention of Consular Relations, Apr. 24, 1963, 27 U.S.T. 77, T.I.A.S. No. 6820 ("Vienna Convention"), and a claim for "Consular Notification." He alleges that, although he was notified by arresting authority of his rights under the Vienna Convention, he was not actually able to contact the Syrian consulate because he was placed "in one facility, but the defendants claim to have him in a different facility . . . where the phones were not working within that facility." Compl. ¶ 98. He also claims that it was a violation of his rights under the Vienna Convention and his right to due process for the

7

defendants to request travel documents for Wassouf from the Syrian Consulate prior to initiating removal proceedings.

Count Fourteen is a claim under the FTCA for intentional and negligent infliction of emotional distress. Wassouf alleges that, in or around May 2010, he discovered that: (1) Judge Hough was "illegal"; (2) the defendants "intentionally and fraudulently conceal[ed] the petitioner's final judgments on that very same case"; and (3) the defendants had stolen and illegally used his passport. Count Fifteen contains a claim under the FTCA for trespass and "intentional negligent supervision." Wassouf asserts there in that the defendants "intentionally obtained and used the petitioner's passport, [w]ithout any courts' [sic] approvals, consent, and or in a violation of any procedures or any legal justifications." Id. ¶ 121.

Count Eighteen is a not claim for relief. Wassouf asks therein for the Court to "consider additional issues outside the pleading," "not to dismiss this complaint for not stating what exact action caused this or that violation," "create its' [sic] own cause of action," and consider claims that would otherwise be barred by the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, 302

## Discussion

### I. Motion for Leave to Proceed In Forma Pauperis

Upon review of the plaintiff's motion for leave to proceed in forma pauperis, the Court concludes that the plaintiff lacks fund to prepay the filing fee. The Court therefore grants the motion.

8

## II. Screening of the Complaint

### A. Court's Authority to Screen the Complaint

Where, as here, a plaintiff is allowed to proceed without prepayment of the filing fee, summons do not issue until the Court reviews the complaint and determines that it satisfies the substantive requirements of 28 U.S.C. § 1915. This statute authorizes federal courts to dismiss a complaint sua sponte if the claims therein are frivolous, malicious, fail to state a claim on which relief may be granted, or seek monetary relief against a defendant who is immune from such relief. See 28 U.S.C. § 1915(e)(2); 28 U.S.C. § 1915A(b). Further, a court has an obligation to inquire sua sponte into its own subject matter jurisdiction. See McCulloch v. Velez, 364 F.3d 1, 5 (1st Cir. 2004). In conducting this review, the Court liberally construes the complaint because the plaintiff is proceeding pro se. See Haines v. Kerner, 404 U.S. 519, 520-21 (1972).

### B. Challenges to Removal Proceedings or Execution of Removal

As this Court has already explained to Wassouf, see, e.g., Wassouf v. United States, C.A. No. 09-11738, document #5, at 5 (D. Mass. Nov. 2, 2009), whether Wassouf's claims are interpreted as a direct or indirect challenge to his removal, or a direct attack on alleged misconduct that resulted in his removal, the Immigration and Nationality Act, as amended by the REAL ID Act, stripped this Court of jurisdiction to entertain such claims. Under the REAL ID Act, this Court is without jurisdiction to entertain a challenge, even an indirect one, to his removal order. Judicial review of an order of removal is only available before the appropriate court of appeals. See 8 U.S.C. § 1252(a)(5). This is true whether the claim is brought under the Federal Tort Claims Act or other federal statute, the United States Constitution, or state law. This is also true whether Wassouf is attacking the government's allegedly fraudulent conduct before the immigration court,

9

the allegedly illegal hiring of Judge Hough, the use of Wassouf's passport to obtain travel documents, or any other alleged misconduct that led to Wassouf's removal. That the plaintiff alleges that the defendants' conduct was outrageous does not alter the jurisdictional limitations of this Court imposed by Congress.

Even if some of Wassouf's claims concerning the immigration proceedings are distinct from a challenge to a removal order, the Court is still without subject-matter jurisdiction over most of his claims. In enacting 8 U.S.C. § 1252(b)(9), Congress attempted to direct challenges to removal proceedings--not just to removal orders--through defined administrative channels. This statute, entitled "Consolidation of questions for judicial review," reads in pertinent part:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under Section 2241 of Title 28 or any other habeas corpus provision . . . or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9). The Supreme Court has characterized this provision as a "general jurisdictional limitation" and as an "unmistakable 'zipper' clause." Reno v. Am.-Arab. Anti-Discrimination Comm., 525 U.S. 471, 482-83 (1999). The First Circuit has observed that the expanse of the statute is "breathtaking," Aguilar v. U.S. Immigration & customs Enforcement, 510 F.3d 1, 9 (1st Cir. 2007), as it encompasses "all questions of law and fact" and extends to both "constitutional and statutory challenges," 8 U.S.C. § 1252(b)(9). "As its text makes manifest, that proviso was designed to consolidate and channel review of all legal and factual questions that arise from the removal of an alien into the administration process, with judicial review of those decisions vested exclusively in the courts of appeals." Id. Thus, where a claim concerning a

removal proceeding can "effectively be handled through the available administrative process," it is subject to the limitations on judicial review set forth in § 1252(b)(9). Id. at 11.

### C. Claim Under the Vienna Convention

Claim Eleven under Article 36 of the Vienna Convention[4] fails because of the jurisdictional

---

[4]Article 36 of the Vienna Convention provides:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

   (a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

   (b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. T he said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;

   (c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.

Vienna Convention, Art. 36, 21 U.S.T. at 100-01, 596 U.N.T.S. at 292-94. The "sending State" is the nation of the arrested foreign national, and the "receiving State" is the arresting nation.

limits discussed above. Further, Article 36 does not provide a private right that is enforceable in federal courts. See Gandara v. Bennett, 528 F.3d 823, 829 (11th Cir. 2008) (Vienna Convention does not confer enforceable individual rights); Mora v. New York, 524 F.3d 183, 195 (2d Cir. 2008) (Article 36(1)(b)(third) does not provide for rights that can be vindicated through a civil rights action or action under the ATS); Cornejo v. County of San Diego, 504 F.3d 853, 860 (9th Cir. 2007) (Article 36 of the Vienna Convention does not create judicially enforceable rights that may be vindicated in an action under 42 U.S.C. § 1983); United States v. Emuegbunam, 268 F.3d 377, 394 (6th Cir. 2001) ("[T]he Vienna Convention does not create a right for a detained foreign national to consult with the diplomatic representatives of his nation that the federal courts can enforce."); cf. United States v. Li, 206 F.3d 56, 66 (1st Cir. 2000) (noting evidence of "a belief among Vienna Convention signatory nations that the treaty's dictates simply are not enforceable in a host nation's criminal courts," and holding that suppression of evidence is not a remedy available for violation of Article 36 of the Vienna Convention); United States Ademaj, 170 F.3d 58, 67 (1st Cir. 1999) ("[T]he Vienna Convention itself prescribes no judicial remedy or other recourse for its violation, let alone vacatur of a conviction."); Anziani v. United States, 2007 WL 1959212, at *3 (D. Mass. July 5, 2007) (denying 2255 motion where litigant argued that he had been denied access to consulate; "In any event, in the view of most courts, the Vienna Convention confers no private right of enforcement on foreign nationals."); but see Jogi v. Voges, 480 F.3d 822, 835-36 (7th Cir. 2007) (Article 36 does provide private right enforceable in a civil rights action). Further, Wassouf does not allege how his inability to call the Syrian consulate actually injured him or that the Syrian consulate attempted to contact him but was unable to do so because he was not reachable by phone or because he had been moved to a different facility.

12

### D. Claims Under the Alien Tort Statute

Wassouf's claims under the ATS (Counts Ten and Twelve) for arbitrary detention and for unspecified cruel, inhuman or degrading treatment fail to state a claim for relief. The ATS provides, "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. However, a claim under the ATS for federal employees acting within the scope of their employment is barred by the Federal Employees Reform and Tort Compensation Act of 1988, or the "Westfall Act," 28 U.S.C. § 2679(b). This statute provides that an action against the United States under the FTCA is the exclusive remedy "for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within n the scope of his office." 28 U.S.C. § 2679(b)(1). This limitation does not apply to a civil action against an employee of the government "(A) which is brought for a violation of the Constitution of the United States; or (B) which is brought for a violation of a statute on the United States under which such action against an individual is otherwise authorized." 28 U.S.C. § 2679(b)(2). A claim under the ATS does not fit under either exception. By definition, a claim under the ATS is not a claim for a constitutional violation, but for a "violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Further, the ATS is not a statutory exception under (B), as the ATS is jurisdictional and does not create a right of action. See Mohammed v. Rumsfeld, – F.3d–, 2011 WL 2462851, at *8 (D.C. Cir. June 21, 2011) (slip opinion) (claim under ATS did not fit under 28 U.S.C. § 2679(b)(2)(B)); cf. Sosa v. Alvarez-Machain, 542 U.S. 692, 724 (2004) ("the ATS is a jurisdictional statute creating no new causes of action").

### E. Claims Under the FTCA

To the extent that any of Wassouf's claims under the FTCA are not precluded by the REAL ID Act, he has failed to allege facts to support a claim under the FTCA. The United States (including its various branches, departments, and agencies) enjoys immunity from suit except in those instances in which it has expressly consented to be sued. See FDIC v. Meyer, 510 U.S. 471, 475 (1994). By passing the FTCA, Congress waived the sovereign immunity of the United States for claims that fall within the purview of the statute. *See* 28 U.S.C. §§ 1346(b), 2671-2680; Barrett ex rel. Estate of Barrett v. United States, 462 F.3d 28, 36 (1st Cir. 2006). However, a plaintiff may not institute a claim under the FTCA in a federal district court until (1) the plaintiff has filed an administrative claim with the appropriate Federal agency "within two years after such claim accrues"; and (2) the agency finally denies the administrative claim or six months pass without a final denial of the administrative claim--whichever comes first. 28 U.S.C. §§ 2401(b), 2675(a). Timely filing of an administrative claim and exhaustion of administrative remedies are jurisdictional prerequisites to filing suit under the FTCA. See Roman-Cancel v. United States, 617 F.3d 37, 42 (2010).

Here, Wassouf alleges that he filed this action within six months of receiving the denial of his administrative claim, but he does not identify the date on which he presented his administrative claim. He does allege that he "timely" presented his claim with the Department of Homeland Security, but the Court is not required to credit this conclusory allegation. See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009).

### F. Claims for Violations of Constitutional Rights

To the extent that Wassouf's claims under the United States Constitution for the retention

14

of his passport and allegedly illegal detention can be considered to be separate from his challenge to his removal, he has failed to state a claim for relief.

Under the doctrine enunciated in Bivens v. Six Unknown Namted Agents fo the Federal Bureau of Narcotics, 403 U.S. 388 (1971), a plaintiff may "vindicate certain constitutionally protected rights through a private cause of action for damages against federal officials in their individual capacities." DeMay v. Nugent, 517 F.3d 11, 14 (1st Cir. 2008). State law establishes the statute of limitations for a Bivens claim. See Barrett ex rel. Estate of Barrett v. United States, 462 F.3d 28, 38 (1st Cir. 2006). Under Massachusetts law, a plaintiff bringing a claim for personal injury or for a violation of his civil rights must file his complaint within three years of accrual of the claim. See M.G.L. ch. 260, § 2A (actions for personal injuries must be brought within three years of the time the claim accrued); M.G.L. ch. 260, § 5B (actions for civil rights actions must be brought within three years of the time the claim accrued). Wassouf's Bivens claims accrued when he knew or had reason to know "of the existence and cause of the injury which is the basis of his action." Barrett, 462 F.3d at 38-39.[5]

With regard any Bivens claim that Wassouf was illegally detained from August 15-August 23, 2007, the plaintiff has not alleged any facts from which the Court may reasonably infer that the claim did not accrue until March 28, 2008–three years prior to the filing of his lawsuit and six months after the detention in question had ended. Wassouf suggests that, at the time the detention occurred, he believed it was illegal because he had been told by the immigration judge and the

---

[5]Although the statute of limitations is an affirmative defense to a Bivens claim, and Fed. R. Civ. P. 8(a) does not require a plaintiff to plead facts to avoid potential affirmative defenses, a complaint can be dismissed for failure to state a claim if the allegations therein show that relief is barred by the relevant statute of limitations. See Bock v. Jones, 549 U.S. 199, 215 (2007).

15

prosecutor that he would be released after the second immigration proceeding terminated on August 15, 2007.

With regard to any Bivens claim that Wassouf's passport was not timely returned to him, the Court likewise cannot reasonably infer that the claim did not accrue until March 28, 2008. According to the complaint, Wassouf believed as early as November 2001 that the government had wrongfully retained his passport.[6] See Schomaker v. United States, 334 F3d. Appx. 336, 338 (1st Cir. 2009) (Bivens claim for violation of Fourth Amendment arising out of federal officer's failure to release plaintiff's property at the completion of criminal proceedings accrued when plaintiff "knew or had reason to know that the government's retention of the property became wrongful").

Moreover, it does not appear that Wassouf had a right to retain his passport when he was incarcerated, on supervised release, or undergoing removal proceedings. Immediately following his release from prison, he was taken into immigration custody to undergo removal proceedings, and it was reasonable for the government to retain his passport, especially in the absence of any motion filed by Wassouf for the return of his passport. See Thye v. United States, 1996 WL 575941, at *1 (E.D.N.Y. Oct. 2, 1996) (arrestee not entitled to return of passport where deportation proceedings were scheduled to take place when plaintiff released from custody); United States v. Beras, 2003 WL 21136727, at *2 (S.D.N.Y. May 15, 2003) (denying convicted defendant's motion

---

[6]Further, the Court notes that, according to a document filed by the government in a case in which Wassouf sought a petition for a writ of coram nobis, Wassouf was notified in November 2001 that the Clerk of the United States District Court for the District of New Hampshire had submitted his passport to the United States Immigration and Naturalization Service. See Wassouf v. United States, C.A. No. 11-00051, document # 8-11 (D.N.H.) (November 27, 2011 letter from the Clerk of Court to Immigration and Naturalization Service stating that Wassouf's expired Syrian passport was enclosed because Wassouf had recently been convicted of a felony in that court; letter indicates a copy of the same was being sent to Wassouf).

under Fed. R. Crim. P. 41(g) for the return of his passport, which no longer had any evidentiary value, because disposition of his passport had to await the result of removal proceedings); <u>Berrum v. United States</u>, 2003 WL 1869248, at *1 (N.D. Ill. Apr. 9, 2003) (where judgment in criminal case indicated that prisoner was a deportable alien, prisoner not entitled to have passport returned to him).[7]

### III. Motion for Appointment of Counsel

Although the Court "may request an attorney to represent any person unable to afford counsel," 28 U.S.C. §1915(e)(1), a civil plaintiff lacks a constitutional right to free counsel, <u>see</u> <u>DesRosiers v. Moran</u>, 949 F.2d 15, 23 (1st Cir. 1991). The Court does not have the funds to pay attorneys to represent plaintiffs in civil cases, and it is very difficult for the Court to find attorneys who will accept appointment as <u>pro bono</u> counsel. To qualify for this scarce resource, a party must be indigent and exceptional circumstances must exist such that the denial of counsel will result in fundamental unfairness impinging on the party's due process rights. <u>See</u> <u>DesRosiers</u>, 949 F.2d at 23. To determine whether there are exceptional circumstances sufficient to warrant the appointment of counsel, a court must examine the total situation, focusing on the merits of the case, the complexity of the legal issues, and the litigant's ability to represent himself. <u>See</u> <u>id.</u> at 24.

As discussed above, the REAL ID Act precludes most of the plaintiff's claim and the plaintiff has failed to state a claim upon which relief may be granted. Therefore, exceptional circumstances that would justify appointment of counsel do not exist.

---

[7]The docket of the detention proceedings in front of Judge Collings does not indicate that Judge Collings ordered the return of his passport.

## Conclusion

Accordingly:

1. The motion (#2) for leave to proceed <u>in forma pauperis</u> is GRANTED.

2. The motion (#3) for appointment of counsel is DENIED.

3. If the plaintiff would like to proceed with this action, he must, within sixty (60) days of the date of this memorandum and order, show good cause in writing why this action should not be dismissed for the reasons state above. Failure to comply with this directive will result in dismissal of the action.

IT IS SO ORDERED.

| | |
|---|---|
| 8/16/2011 | /s/ Joseph L. Tauro |
| DATE | UNITED STATES DISTRICT JUDGE |